WHITE (ADAMS v.). See Case No. 68.

---

## Case No. 17,535.

### WHITE et al. v. ALLEN.

[2 Fish. Pat. Cas. 440; 2 Cliff. 224; Merw. Pat. Inv. 705.] [1]

Circuit Court, D. Massachusetts. Nov., 1863.

PATENTS—PRESUMPTION OF ORIGINALITY—FOREIGN PATENTS—PRIORITY OF INVENTION—REDUCTION TO PRACTICE — ABANDONMENT — TRANSLATING FOREIGN PATENT—FIRE ARMS.

1. The presumption of originality arising from the grant of a patent only extends back to the time when the application was filed in the patent office.
[Cited in Seymour v. Osborne, 11 Wall. (78 U. S.) 538.]

2. Where a foreign patent, granted before the application of the American patentee, is relied upon to destroy the novelty of the American patent, the patentee may prove that his invention was made prior to the granting of the foreign patent.

3. While the suggested improvement rests merely in the mind of the originator of the idea, the invention is not completed within the meaning of the patent law, nor are crude and imperfect experiments sufficient to confer a right to a patent.
[Cited in La Baw v. Hawkins, Case No. 7,960; Reeves v. Keystone Bridge Co., Id. 11,660; Gottfried v. Philip Best Brewing Co., Id. 5,633.]

4. Mere discovery of an improvement does not constitute it the subject-matter of a patent, although the ideas which it involves may be new, but the new set of ideas, in order to become patentable, must be embodied into working machinery and adapted to practical use.

5. While he is the first inventor who has first perfected and adapted the invention to use, yet this general rule is subject to the qualification that he who invents first shall have the prior right, if, as is prescribed in section 15 of the act of 1836, he is using reasonable diligence in adapting and perfecting the same within the meaning of that provision.
[Cited in Judson v. Bradford, Case No. 7,564; National Filtering Co. v. Arctic Oil Co., Id. 10,042; Electrical Signal Co. v. Hall Signal Co., 6 Fed. 606; Christie v. Seybold, 55 Fed. 76.]

6. Where an invention is voluntarily broken up and laid aside, without any controlling impediment in the way of an application for a patent, and another, in the mean time, invents the same thing, without any knowledge of that which is so suspended, and reduces the same to practice, applies for and takes out his patent, and introduces the patented invention into public use, he must be regarded as the original and first inventor of the improvement.
[Cited in Consolidated Fruit Jar Co. v. Wright, Case No. 3,135; Seymour v. Osborne, 11 Wall. (78 U. S.) 538.]

7. Where the patentee invented an improvement as early as the year 1849, and continued to experiment and perfect his invention until 1852, but did not apply for or obtain his patent until 1855, but it appeared that, during the whole time from 1849 to 1855, he was in the employ of one who held a prior and controlling patent, which prevented the use of his improvement, and it appeared that he delayed his application, and was advised to delay it on this account, only—held, that these facts did not prove abandonment, and that the patent granted in 1855 was valid, notwithstanding a patent granted in Belgium June 16, 1853, to other parties.

8. In determining the proper reading of a disputed translation of a foreign patent, the following considerations are applicable: (1) Which translation is most literal; (2) the question should be examined in view of the other parts of the instrument not involved in any doubt: (3) recurrence should be made to the nature of the invention to see if it is consistent with either or both readings: and (4) if it be found that one of the translations is repugnant to other parts of the instrument, and the other is consistent with the other parts, it will be safe to adopt the latter.

9. The phrase, "se chargeants par la culasse" does not mean "breech loading," but "loading at the breech."

---

[1] [Reported by Samuel S. Fisher, Esq., and by William Henry Clifford, Esq., and here reprinted by permission. Merw. Pat. Inv. 705, contains only a partial report.]

10. Letters patent granted to Rollin White for an improvement in repeating fire arms, dated April 3, 1855, examined and sustained.

This was a bill in equity filed to restrain the defendant [Ethan Allen] from infringing letters patent [No. 12,648] for an "improvement in repeating fire arms," granted to Rollin White, April 3. 1855, the exclusive right to manufacture which improvement was assigned to Horace Smith and Daniel Wesson, November 17, 1856 The invention consisted in extending the chambers of the rotating cylinder of a revolving fire arm right through the rear of said cylinder, for the purpose of loading the chambers at the breach from behind, either by hand or self-acting charges; and also in certain devices intended to adapt the main improvement to practical and successful use.

The claims of the patent were as follows: "I claim: 1st. Extending the chambers a a of the rotating cylinder A right through the rear of the said cylinder, for the purpose of enabling the said chambers to be charged at the rear, either by hand or a self-acting charger, substantially as described. 2d. The application of a guard to cover the front of all the chambers of the cylinder which are not in line with the barrel, or any number thereof which may have been loaded, combined with the provision of a proper space for the lateral escape of the exploded powder, substantially as described, whether the said space be between the cylinder and guard, or in rear of the cylinder, and whether the said guard be constructed with a recess to receive the balls, or be of such form as merely to stop the balls. 3d. Combining a charging piston C with the hammer, by means of gearing, substantially as described, or by the equivalent thereof, in such a manner that, by raising the hammer to cock the lock, the piston is moved toward the chambered cylinder to force a cartridge from the magazine into one of the chambers thereof, and by the falling of the hammer, the piston is withdrawn to allow a new cartridge to be supplied readily to be driven into the next chamber of the cylinder, as the hammer is again raised to cock the piece, as fully set forth 4th. Furnishing the hammer with an attachment m, by which in the act of falling, it may close the mouth of the magazine, substantially as described, before exploding the priming, and thus protect the charges within the magazine from ignition."

2 [The respondents produced and put in evidence letters-patent granted to Hertog and Devos, in Belgium, on the 17th of June, 1853, as anticipating the complainants' patent by about two years. It appeared from the testimony that, under this foreign patent, pistols constructed in conformity with the first claim of the complainants were publicly sold in the years 1853 and 1854. A French patent of one Lefaucheux was also introduced by the respondents as exhibiting a series of revolving

barrels, each with an opening at the rear end for convenience in loading, and having a guard-plate or breech-plate to prevent the passage of the flame towards the rear, at the discharge. It was contended by the respondents that complainants' pistol was simply the application of the Lefaucheux method to the arm known as the Colt pistol, where the breech is composed of a cylinder of chambers. arranged upon a common centre, so located that as the cylinder revolves, the several chambers are brought in succession, in line with the barrel, to be fired. The pistol manufactured by the respondents consisted of a many-chambered cylinder bored entirely through, the calibres being cylindrical instead of conical, and using a cartridge with a flange at the but, and all of the chambers arranged in a circle, and charged at the rear. The respondents contended, that upon the evidence of the first-named complainant, he had not shown by his account of his experiments that he had, prior to June 16, 1853,—the date of the Hertog and Devos patent,—made an invention, in the sense of the patent law, of the thing claimed by him, in the first claim; and if so, that he subsequently abandoned his invention. Sufficient attention to this part of the testimony is found in the opinion of the court. The respondents admitted that they had manufactured and sold revolving cylinder pistols, having the chamber bored right through to the rear, so as to be loaded at the rear.

[E. W. Stoughton, C. M. Keller, and E. F. Hodges, for complainants. When a patentee sues for infringement of his invention, and old machines or public descriptions are set up as prior thereto, he has a right to go back, not merely to the time when he reduced his invention to a practical working form, but to the time when he developed it as an intellectual conception, and reduced it to such condition that an artisan could make it from his description. Philadelphia & T. R. Co. v. Stimpson, 14 Pet. [39 U. S.] 448. An infringer, in order to defend himself, if he sets up a prior machine, must show that he reduced it to a practical working form; but a patentee, in order to show the date of his invention, is not compelled to make that proof, but may show when the invention was so far completed that the work of the artisan only was requisite to reduce it to practice. The question of abandonment is always one of intent, to be gathered from the evidence, unless evinced by permitting an invention to be used by the public so long that the court will presume the party intended to abandon it. There is no evidence of abandonment in this case. The respondents cannot say that complainants' invention. which they have used, is a useless one. If it is said that respondents employ the complainants' invention with improvements which make it useful, then this proves that the original invention was useful. Gray v. James [Case No. 5,718].

[B. R. Curtis and Causten Browne, for respondents. No invention, in the sense of the patent law, was made by the complainant in 1849. This is a case where an American inventor is endeavoring to make a title against the public, who had come into possession of the thing patented, under a foreign patent, brought into use in this country before the American patent was taken out. In such case it is not enough for the inventor to show that at a prior date he had done something in his own mind, or written it upon paper; he must show that he embodied the invention in practical form. Johnson v. Root [Case No. 7,409]; Cahoon v. Ring [Id. 2,292]. The opening of the bores at the rear was not new when used by the complainant. The complainants' invention, if there was any, consisted in the application of this system to the many chambered pistol. The application of an existing device or mode of operation, to an analogous subject. no new means of application being devised, is not the subject of letters-patent, and if new means are devised, then the patent is limited to those means. Brunton v. Hawkes, 4 Barn. & Ald. 541; Bean v. Smallwood [Case No. 1,173]; Horton v. Mahon, 6 Law T. (N. S.) 289; Ormson v. Clarke, 7 Law T. (N. S.) 361; Brook v. Aston, 8 El. & Bl. 478.] [2]

CLIFFORD, Circuit Justice. This is a bill in equity brought by the complainants to recover damages for an alleged infringement of certain letters patent belonging to them, and praying for an account and for an injunction. Letters patent were duly granted to the said Rollin White April 3, 1855, for certain new and useful improvements in repeating fire arms, and the complainants allege that prior to the granting of those letters patent, he was the original and first inventor of the improvements therein described, and that the other two complainants. on November 17, 1856, by virtue of a certain contract or assignment of that date. became, and are, the owners of the sole and exclusive right to make. use, and vend the improvement embodied in the first claim of the patent. They also allege that the respondents had full knowledge of the existence of the patent, and of their exclusive rights under it, and that they, the respondents, at Worcester. in this district, on January 1. 1858. and since that time, have unlawfully made and sold twenty-five thousand pistols and revolving fire arms, substantially embracing their patented improvement. Respondents admit that the letters patent set forth in the bill of complaint were granted to Rollin White, but they deny that he was the original and first inventor of the improvements therein described. On the contrary, they allege that anterior to the supposed discovery thereof by the patentee, the same invention. or substantial and material parts thereof, claimed therein as new, had been described in certain public

works, and had been patented to various persons in foreign countries, and that the same had previously been invented by, known to, and used by divers persons, at the several places in the United States. as alleged and fully set forth in the answer. and they also allege that the improvements attempted to be patented to the supposed inventor, had been in public use and on sale for more than two years before his application for a patent therefor. and with his consent and allowance, and they deny that the patentee did, at any time prior to the date of his patent, invent and reduce to practice any such improvements as those described and claimed in his specification. Application for the patent was filed February 20, 1855, and the letters patent were duly granted to the patentee at the time alleged in the bill of complaint. Patentee states in the specification, that his invention relates to fire arms having the rotating, many-chambered cylinder. and he therein divides the supposed improvements into four parts, but reference will here be made more especially to the first part, as that is the only one which necessarily comes into revision in this case. Adopting the general description of the specification, it consists in extending the chambers through the rear of the cylinder, for the purpose of loading them at the breech from behind, either by hand or by a self-acting charger, from a magazine placed in the rear of the cylinder. Description is also given of the several elements of which the improvement under consideration is composed.

Omitting the references to the drawings, the description is in substance and effect as follows: First. The rotating, chambered cylinder having the chambers bored right through it and made slightly conical. with the smallest part in front, in order that a cartridge may be inserted easily at the back and that the ball may fit tight, so that when it arrives in its place it shall remain and not go through till the charge explodes. Secondly. The pin upon which the breech rotates, by means of a tooth attached to the trigger. Thirdly. The stock. which is constructed with a recess or groove in the side of it, to afford sufficient room in rear of the cylinder. opposite one of the chambers, for the insertion of a charge by hand. at the rear opening of the chamber. Fourthly. The fixed breech piece arranged opposite the barrel, behind the cylinder, to serve as a breach to the chamber, which happens to be in line with the barrel. Based upon that description. the claim involved in this suit is, extending the chamber of the rotating cylinder right through the rear of the said cylinder, for the purpose of enabling the said chamber to be charged at the rear. either by hand or by a self-acting charger. substantially as described.

Recurring to the answer. it will be seen that the respondents admit that they have manufactured and sold revolving cylinder pistols, having the chambers of the cylinder

[2] [From 2 Cliff. 224.]

bored right through to the rear, so as to be loaded at the rear, and the same admission was made at the argument, without any qualification whatever. Considering the state of the pleadings, and in view of the admission of the respondents, it is quite evident that the principal question presented for decision is, whether Rollin White is or is not the original and first inventor of the improvement embodied in the first claim of his patent?

Power to grant letters patent is conferred by law upon the commissioner of patents, and when that power is lawfully exercised, and a patent has been duly granted, it is prima facie evidence that the patentee is the original and first inventor of that which is therein described and secured to him as his invention. Availing themselves of that rule of law, the complainants introduce the patent granted to Rollin White, and contend—and well contend—that its effect is to cast the burden of proof upon the respondents to prove the defense set up in the answer. Conceding the rule of law to be as stated, the respondents introduced two foreign patents on which they chiefly rely to establish their defense. Both of those patents will be examined, but it will be more convenient to reverse the order adopted at the bar, because the complainants admit that the one granted in Belgium to Hertog & Devos, June 16, 1853, is for the same invention as that embodied in the first claim of the patent on which the suit is founded. Granting that proposition, it is obvious that the suit can not be maintained, unless it appears that the invention claimed by the complainants was made by the patentee at some period prior to the date of that patent. Complainant's patent was granted, it will be remembered, April 3, 1855, long after the date of the foreign patent, and the presumption of originality, arising from the granting of the same, only extends back to the time when the application was filed in the patent office, which was on February 20 in the same year. Unless, therefore, the complainants show that the invention embodied in the patent claimed by them was made and reduced to practice prior to June 16, 1853, they can not prevail in the suit, and the burden of proof is shifted upon them to establish those facts. They do not controvert any of these propositions, but refer to the deposition of the patentee, and insist that his testimony, as there exhibited, establishes the priority of his invention over that described in the foreign patent under consideration. According to his testimony, he learned the gun-making business of his brother, J. D. White, at Williamstown, in the state of Vermont, and he states that the first fire arm he ever saw, so constructed as to be loaded at the breach, was a flint-lock pistol, owned by his father, when he was about ten years of age. His description of the pistol is, that the barrel unscrewed from the breech pin and received the charge at the rear end,

and, of course, when the cartridge was placed in position, had to be rescrewed to the breech pin before the pistol could be fired. Assuming his statements to be true, he himself first contrived a plan for a repeating pistol in 1837, but he admits that he never constructed a fire arm or model on that plan until he made the illustrative model produced before the commissioner at the time he gave his deposition in this case. When he made that plan, he contemplated, as he represents, extending the bore of the chambers through the breach, for the purpose of loading in the rear of the chamber, and he also states, to the effect, that the charges were to be held in the respective chambers by a leather packing. Inquiry was also made of the witness, what, if anything, was to resist the discharge at the rear end when the pistol was fired, and his answer was, that the chamber in line with the barrel would rest against the pinion that revolved it, and that the pinion, on the plan suggested, would form the breech to the chamber as the discharge should take place; and he also stated, in answer to a further inquiry, that the plan contemplated communicating the fire for the discharge by means of nipples, to be inserted into the chamber in front of the packing, to be employed to hold the charge in place. Useful as the fire arm suggested might have been, if the plan had been carried into effect, and the invention had been completed, still it is obvious that the mere conception of the improvement by the witness, however perfect the idea may have been, and although he actually described the plan to one person, can not benefit the complainant in this case, because his own testimony shows that he never completed the invention, and reduced it to practice, in the form of an operative fire arm. Original and first inventors are entitled to the benefits of their inventions, if they reduce them to practice, and seasonably comply with the requirements of the patent law, in procuring letters patent for the protection of their exclusive rights. While the suggested improvement, however, rests merely in the mind of the originator of the idea, the invention is not completed within the meaning of the patent law, nor are crude and imperfect experiments sufficient to confer a right to a patent; but in order to constitute an invention, in the sense in which that word is employed in the patent act, the party alleged to have produced it must have proceeded so far as to have reduced his idea to practice, and embodied it in some distinct form. Gayler v. Wilder, 10 How. [51 U. S.] 498; Parkhurst v. Kinsman [Case No. 10,757]; Curt. Pat. § 43. Mere discovery of an improvement does not constitute it the subject-matter of a patent, although the ideas which it involves may be new; but the new set of ideas, in order to become patentable, must be embodied into working machinery and adapted to practical use. Sickels v. Borden [Case No. 12,832].

Whoever first perfects a machine and makes it capable of useful operation, says Judge Story, is entitled to a patent, and he accordingly held, in Reed v. Cutter [Case No. 11,645], that an imperfect and incomplete invention, resting in mere theory, or in intellectual notion, or in uncertain experiments, and not actually reduced to practice, and embodied in some distinct machinery, apparatus, manufacture, or composition of matter, was not patentable, under the patent laws of the United States. Pursuant to that rule, the same learned judge also held, that he is the first inventor, in the sense of the patent act, and entitled to a patent for his invention, who has first perfected and adapted the same to use, and that, until the invention is so perfected and adapted to use, it is not patentable under the patent laws. Washburn v. Gould [Id. 17,214]; Woodcock v. Parker [Id. 17,971]. Taken as a general rule, no doubt is entertained of the correctness of the proposition as stated, but it must be regarded as subject to the qualification, that he who invents first, shall have the prior right, if, as is prescribed in section 15 of the patent act, he is using reasonable diligence in adapting and perfecting the same within the meaning of that provision. Reed v. Cutter [supra]; Marshall v. Mee [Case No. 9,129], per Dunlap, J.; Bartholomew v. Sawyer [Case No. 1,070]. Careful attention, however, must be paid to other portions of the testimony of this witness. Pistols, with a cluster of barrels revolving on an axis, so that each barrel may in turn be brought into proper line to be fired, were first seen by him, as he states, in 1839, at the shop of his brother in the state of Vermont, where he learned his trade, and he also states that, upon seeing it, he suggested to his brother, the expediency of cutting off the barrel in front of the breech, for the purpose of loading it in the rear end of the barrel. His statement is, that he made the suggestion in 1839, but there is no evidence that any such experiment was made at the time, or that any attempt was then made to carry the suggestion into effect. Witness subsequently gave some attention to the subject of inventions, and in 1841 a patent was granted to him for an improvement in looms for weaving bolting cloths. Eight years after the date of this patent, he went to work for Samuel Colt, in the manufacture of repeating fire arms. On that occasion, he worked there from February to April, and then left, but he returned again about the first of August, in the same year, and continued there engaged in that work, from the time he so returned, until December, 1854, when the owner of the establishment ceased to manufacture by contract. When he first went there, he had a contract for turning barrels under his brothers, and when he returned again, he took another contract under them for rifling and polishing the barrels, but from April, 1852, to the time he finally left, he worked under a contract with the owner to manufacture certain parts of the locks. Certain experiments in constructing a pistol having a rotating cylinder with the chambers bored entirely through, and in the use of it after it was constructed, were made by the witness during the period he was at work in that establishment; and in view of their importance in this investigation, they will be separately considered.

(1) Before he left the first time, and while he was at work turning barrels, he procured two refuse Colt's cylinders, borrowed a cutting-off tool of an acquaintance, placed them in a lathe that he used for turning the barrels, and cut off the front of one and the rear of the other, so that the two parts when put together, that is, the front of one and the rear of the other, would make a cylinder of about the usual length. Easily as the alteration was made, still it is evident that the result effected by it was of very great importance, as it constituted the front part a cylinder of chambers, bored entirely through, so as to admit the charges to be inserted at the rear end, and it, at the same time, constituted the rear part cut off from the other cylinder, a breech to close up the chambers after the cartridges were placed in position. Flanged cartridges were not used by him in that experiment, but he drilled out the rear end of the chamber, making it a little larger than it was at the front, for the purpose of holding the ball in position. Drilling out the rear end of the chamber, leaving the front of the same diameter as it was before, had the effect to form a flange in the same, against which the ball would rest when inserted at the end so enlarged, and was designed, undoubtedly, to answer the same purpose as the flanged cartridge, or the conical bore of the cylinder which has since been introduced. Circumstantial account is then given of what he subsequently did with the parts so selected, and of the way in which he attached them to the lock frame of a pistol which he borrowed for the purpose of the experiment, and of the manner in which he loaded and fired the arm so constructed and arranged. When he had completed the parts as described, he carried them to his boarding-house, procured a Colt revolving pistol of a fellow boarder, took off the barrel and the cylinder, charged one chamber of the cylinder he had prepared, with powder and ball, putting the ball foremost, and inserting the charge into the chamber until the ball came in contact with the flange or shoulder made by the drilling, and then arranged the cylinder and breech together, as already described, and fastened on the barrel, which completed the arrangement. Desiring to fire it secretly, for reasons which will presently appear, he then went across the street to a neighboring shop, and there made inquiry of the foreman, who was a workman of his acquaintance, whether or not there was a good place in the shop where he could fire his newly-constructed pistol. Responsive to that inquiry, he was shown into the basement of

the building, and there he arranged the parts of the pistol in proper position, and fired the charge through an open space in the floor, into the water below. Whether the owner of the shop knew that he was there or not, the witness is not able to state, but the workman who showed him the place knew it, and the witness thinks he was near when the pistol was fired. Regarded as a whole, the experiment, as the witness states, was not satisfactory, because there was so much escape of the flame, that if the other chambers had been charged in the same way, the charges would have ignited.

(2) Witness made another experiment about the same time, but with a much better result. He employed, on the second occasion, the same cylinder and breech as on the first, and he loaded it in the same way, except that he did not quite fill the chamber with powder, leaving sufficient space, so that he could put in a packing prepared for the purpose, which consisted of a piece of leather, fitted to the bore of the chamber, and inserted behind the powder, and made with a central conical hole, larger on the inside than the outside, and which, it was supposed, would be so expanded by the discharge as to prevent the escape of the flame at the rear. Having perfected the leather packing, and put the pistol in order for use, he went to the same shop as before, and fired it again in the basement of the building, and he states, without qualification, that the packing stopped the escape of the flame, and that he was satisfied with the experiment. Both of these experiments were made while the witness was engaged in turning pistol barrels in the establishment of Samuel Colt, and before he left there the first time.

(3) Subsequently to that time, and after he came back in the month of August, in the same year, he made a third experiment. Whether he took the same breech, or another with a ratchet on it, so that it could be turned by the machinery of the lock, is immaterial in this investigation, as in all other particulars they were substantially the same, so far at least as respects the questions involved in this controversy. Attention to what he did on the occasion, will show that the experiment was one of very great importance. First, he loaded all the chambers with powder and balls, nearly filling the chambers with loose powder, and putting in the leather packing, as described in the preceding experiment, and he states that each chamber had its nipple, and that all were capped. Secondly, having loaded all the chambers of the cylinder and adjusted the breech to the same, he again borrowed a Colt's pistol, either of the same person or of his brother, took off the barrel and cylinder, as he had done before, and attached the loaded cylinder, together with the breech, to the lock frame, as before explained, and put the same in order for use. Thirdly, he then proceeded to the same shop, and there, in the basement of the building, fired and discharged all the chambers, one after another, and he states

that the pistol operated well and to his satisfaction, and that it was seen by one of the workmen in the shop, and by one of his brothers.

(4) His fourth experiment was indubitably made with a Colt's cylinder, having the ratchet arrangement on it, and its importance consists, not only in the improvements made, both in the cylinder and the breech, but also in the fact that the witness successfully repeated all that he had accomplished in the preceding experiment. Employing the language of the witness, his statement is, that "he drilled the breech the size of the chamber" through to the recess cut for the shoulder of the nipple, and then he borrowed an arbor, put the cylinder into it, and turned off the rear part of the same below the center, so that he could insert a cartridge in the rear. Particular attention should also be given to the several improvements made in the breech and its attachments or connections, and in the general arrangement of the arm. Adopting the same course as on the former occasion, he procured another refuse cylinder that had the central hole in it, cut off the rear end of it as he had done before, drilled the hole larger, so that it would slide on to the rear part of the cylinder he had just prepared for the experiment, and in that manner formed the breech, and having arranged the breech, he drilled a hole and inserted a nipple, and then attached the cylinder to the lock frame, marking it by the frame so that he could make it correspond with the recess in the lock frame for the purpose of capping the nipple, and he states, in respect to this experiment, that he so constructed the pistol that he could load it in the rear without removing the cylinder from the lock frame. Constructed and arranged as described, he loaded the pistol, using packing to stop the escape of the flame, and went to the same shop and fired it; and he states that it operated satisfactorily, as it could hardly fail to do, as it was obviously precisely such an arm as that described in the patent on which the suit was founded. Doubt can not be entertained that the pistol, as described, was a complete arm; that the cylinder of chambers could be turned in front of a stationary breech by the mechanism of the lock, and that the several chambers of the cylinder could be brought in succession to the line of the barrel to be fired; and it is equally clear that it was so constructed and arranged that the charges could be inserted in the rear of the chamber without removing the cylinder. Precise dates are not given in respect to and of these experiments, but the proof is, as already exhibited, that they commenced as early as March or April, 1849, and that the one last mentioned was made during the latter part of that year, or the fore part of the year 1850.

(5) During the next year he made a fifth experiment, with a view to use Sharp's cartridges, with a cylinder like the one he had contrived, and, to make the trial, he took the same pistol used in the preceding experiment,

or one like it; but a portion of the recoil shield was cut away, so as to let the cartridge project out of the rear, leaving a shoulder on the recoil shield near the nipple, and the arrangement was such, that a knife projected over, and coming in contact with the cartridge, would cut it off at the rear end, so that when it came in line of the barrel, it would be ignited. Loading one chamber only, he could fire it with safety under the arrangement, but when the series of chambers were loaded, he found that upon firing it three or four went off at the same time, and the result was that the experiment was not satisfactory. All of these experiments, it will be remembered, were made by the witness while he was in the employment of Samuel Colt, and during the period when his employer was in the full enjoyment of his patent for his revolving pistol. Contracts held by him or his brothers gave him a profitable business, and he could not afford to relinquish it; and if he could and had done so, it would have availed him little or nothing, as his invention was only an improvement upon that of his employer. Fear of losing employment, and perhaps the dread of prospective litigation, deterred him from any attempt to secure a patent, and so he continued assiduously to fulfill his contracts, and occasionally to prosecute his experiments.

(6) Failing to adapt the arm he had invented to the use of the particular cartridge mentioned, his next effort was to see if he could not construct a joint between the breech plate and the rear end of the cylinder, sufficiently close by the contact of the metal surfaces to prevent the escape of the flame when the pistol was fired, without the necessity of using the leather packing, or any other equivalent means to confine the powder within the chambers; and with a view to determine that matter, he, in the year 1852, made a sixth experiment, which is the last to be particularly noticed in this investigation. Commencing as before, he procured two cylinders of the same kind, cut off the front of one, to be used as such, and the rear of the other, to be used as a breech, brazed a plate over the nipples of the latter, so as to make the surface smooth, and fitted the part used as a cylinder, and the breech, together as closely as he could, and have the arm the proper length to revolve in the lock frame. What he was endeavoring to accomplish was, to make the joint so tight that upon firing the pistol, the flame would not escape from one chamber to the others, and having perfected the arrangement as well as he could, he loaded the pistol, placed it in the lock frame and fired it, but the result was, that he found he could not prevent the escape of the flame in that way. Abandoning that idea as hopeless, he mentioned the failure to his brother, and told him what the result had been, and his brother inquired of him if he was sure he could accomplish the desired result by the use of the leather packing, and he, the

witness, told his brother that he was, and to satisfy him that he could do so, he loaded the pistol, using the leather packing, and fired it, and carried the breech to the shop and exhibited it to his brother for his satisfaction. No appearance of any escape of flame or smoke could be seen, as the witness states, except what appeared in the hole of the leather packing, where the fire from the cap communicated with the charge. Witness exhibited the breech used by him on that occasion, before the commissioner, when he gave his deposition, and its identity is fully established by the testimony, and it is also fully proved that the same cylinder was preserved and used by him in constructing his model for the patent office. Much testimony was introduced by the complainants, to confirm the testimony of the patentee in relation to those several experiments, but it will be sufficient to say, without reproducing the testimony, that I am of the opinion that his statements are correct, and that no one of them, which is of any importance in this investigation, has been successfully contradicted. Taking the statements as true, they show that the patentee made the invention described in the first claim of the patent, and reduced it to practice as an operative fire arm, within the meaning of the patent law, as early as the fall of 1849, or the fore part of the year 1850, when his fourth experiment was completed.

Suppose it to be so, still it is insisted by the respondents that the supposed inventor afterward deserted and abandoned his invention, and, consequently, that he cannot be regarded in this controversy as the original and first inventor of the improvement. But if that proposition cannot be sustained, then they contend that the proofs show that he took the pistol he constructed apart, and laid the materials aside for years, as something incomplete and requiring more thought and experiment, before he attempted to restore the invention, and without any definite intention of resuming the undertaking, and they insist that the rule of law upon that state of the case is, that if another in the mean time invents the same thing, without any knowledge of that which is so suspended, and reduces the same to practice, applies for and takes out his patent, and introduces the patented invention into public use, he is entitled to the benefits of his skill and diligence, and must, in judgment of law, be regarded as the original and first inventor of the improvement, although it may appear that the final experiment of the other party was so far completed that the machine, or other invention, was, in fact, the proper subject of a patent, and that the materials were laid aside to preserve the parts, to be used or not in the future, as circumstances should arise, or as he should thereafter determine, yet without any positive unconditional intention of relinquishing

what he had accomplished, or of abandoning the invention. Nothing need be remarked in respect to the first of these propositions, except to say, that the evidence in the case is not sufficient to support it, and it is accordingly overruled. Unlike the first, the second deserves to be more carefully considered. Cases undoubtedly occur, such as are supposed in the proposition, where an individual employed in inventing, or in making experiments in that behalf, feeling dissatisfied with the result of his efforts, becomes discouraged in prosecuting the investigation, and finally loses all confidence in the prospect of his ultimate success, and under the influence of such discouragements, or from a desire to engage in more profitable business, or to pursue a more pressing or favorite undertaking, decides to break up what he has accomplished, and lays the parts aside, not positively intending to abandon the subject, yet wholly uncertain whether he will ever resume it or make any further use of the parts so laid aside. Such cases are doubtless of frequent occurrence, and while they do not show an unconditional abandonment of the undertaking, they do show an indefinite suspension of the same, and an entire uncertainty during such suspension, whether the interested party will ever furnish the invention to the public. Where an invention is thus voluntarily broken up and laid aside, without any controlling impediment in the way of an application for a patent, and under all the other conditions specified in the preceding proposition, and another, in the mean time, invents the same thing, without any knowledge of that which is so suspended, and reduces the same to practice, applies for and takes out his patent, and introduces the patented invention into public use, I am of the opinion that he must be regarded as the original and first inventor of the improvement. Federal courts have everywhere held that an inventor, who has first actually perfected his invention, will not, if he has exercised good faith, be deemed to have surreptitiously or unjustly obtained a patent, for that which was in fact first invented by another, unless the latter was at the time using due diligence in adapting and perfecting what he had accomplished; and it was expressly held in Ransom v. Mayor of New York [Case No. 11,573], per Hall, J., that if a person does not use due diligence, in perfecting his invention after he has conceived the idea, and another conceives the same idea and perfects it, and secures his patent and applies it to use, the latter will be considered as the original and first inventor, and that a patent granted to the former will be void. See Reed v. Cutter [supra].

But the question to be decided in this controversy is, whether the proofs exhibited in the record bring this case within the operation of that rule of law? Some of the parts used in the several experiments to which reference has been made were preserved, as, for example, the revolving breech constructed with the nipples in it, as used in the sixth experiment, and it is an exhibit in the case, and the cylinder used in the same experiment, and several others of the identical parts used in those experiments were also preserved, and put into one or the other of his patent office models. Most or all of the other parts were put into a box, and were kept for a time in the attic of the house where he lived, and he states that when he moved from there, in shipping his goods, he lost the box, together with the materials, and it is upon the loss of these materials, and the delay that ensued in applying for a patent, that the respondents chiefly rely to support the theory of fact involved in the proposition. On the other hand, it undeniably appears that the invention held by the complainants is only an improvement upon the patented invention of Samuel Colt, who, for a long series of years, was an extensive and successful manufacturer of revolving pistols. Full proof also is exhibited that the patentee of the invention, under whom the complainants hold, was in the employment of that same manufacturer from the time he made his first experiment until he commenced to make his preparations with a view to apply for his patent; and that throughout that entire period, the well-known patent of his employer was in full operation. Direct inquiry was made of the patentee in this case, why it was that his application for a patent was so long delayed, and his answer was, that it was because his employer had a patent for the mode of revolving the pistol embraced in his improvement, and which he desired to use, and also because his employer had discharged certain men who had been experimenting on revolving pistols. Two or more of his brothers were employed in the same establishment, and on one or more occasions, when the witness exhibited his pistol to his brothers, he proposed to show the same to his and their employer, but they objected and remonstrated against the suggestion, upon the ground that if it were done, they would all lose their places. Meeting with these discouragements, he delayed his application for a patent, but there is no ground whatever to conclude that he ever, for a moment, intended to postpone his application for a patent any longer than it became necessary that he should do so in order to overcome those difficulties, and, consequently, the theory of fact involved in the proposition, can not be sustained.

Mention has not been made of the patent of John H. Johnson of April 17, 1854, because it is subsequent in date to the other foreign patent, and of course must fall within the same category.

Examination must also be made of the Lefaucheux patent of May 2, 1845, and also of a subsequent patent granted to the same per-

son, as set forth in the certificate of addition, of the seventh of February of the following year. Both of these patents, it will be observed, are prior to the date of the invention, embodied in the patent on which the suit is founded, but reference will only be made to the one first granted, as the means of explaining the invention described in the second, as it is not pretended that the first is of a character to supersede the invention held by the complainants. Parties agree, substantially, as to what the state of the art was at the time when the foreign patent under consideration was granted. Prior to that invention, there were two classes of fire arms which were well known and in extensive use. First, there was the pistol, sometimes called the pepper-box pistol, which was largely manufactured in foreign countries, and by Ethan Allen in the United States. When first introduced, it consisted, as usually constructed, of an aggregation of five or six barrels, which were formed by boring the several calibers in a solid block of metal, and the whole series were arranged in a circle about a central hole, fitted to a spindle projecting from a shield plate, and, of course, they could only be loaded at the muzzle, as the bore of the barrels did not quite extend to the other end of the block, which was unperforated, and left solid to serve as the breech of the fire arm. Improvements were made in that pistol, and patents were granted for those improvements, but they all had too much weight for a portable arm, and were more or less difficult of accurate aim, on account of the excess of weight at the muzzle, as compared with the ordinary pistol, and the consequent tendency to lower the muzzle in pulling the trigger. Following these improvements came the invention of Samuel Colt, which all admit was an improvement of great value. Instead of a cluster of rotating barrels, he provided a single barrel, which was connected with the handle of a stock, as in the ordinary pistol, and, in addition to the barrel, there was a cylinder of chambers, whose front end was joined to the barrel, and which were arranged upon a common center, and so located that, as the cylinder was turned, the several chambers were in succession brought in line with the barrel to be fired. Certain defects, however, always existed in that arm, and, among the number, was the want of efficient means to control or overcome the tendency of the recoil of the arm, when fired, to cause the remaining cartridges to protrude from the front of the cylinder; and whenever that happened, it would prevent the cylinder from revolving, so as to bring the next charge into the proper position. No remedy for that difficulty was shown in the patent, except that of ramming the cartridges in tight, and experience showed that the remedy was not always adequate to accomplish the purpose for which it was suggested. Such was the state of the art, as shown in this case, when Lefaucheux obtained his first patent "for arrangements of

breech-loading pistols." According to his description of his invention, he forged the barrel of the pistol with a socket, having a cylindrical hole parallel to the bore of the barrel. By that socket, the barrel was united to the body of the pistol, by means of a fixed stem or arbor, which had a screw cut on its end, and which passed through the whole length of the socket, and bore on its end the thread of a screw to receive a nut, by which the barrel was held more or less tight, and the patentee states that it is only necessary to turn this nut slightly to the right or left, in order to fasten the barrel in its place or separate it from its connections, as circumstances may require; and he also describes the device on one side of the lock plate, which is designed to stop the barrel at the proper point, when turned on the arbor to be loaded, in order that it may be brought back, after it is charged, to its original position, to be ready to be fired. Loading was accomplished, as described, by swinging the barrel laterally so as to expose the rear end; and when the arm is charged, it is then brought back to its original position, so that the rear end may be closed by the breech plate. Important improvements were made in that invention, as appears by the description given of the same, in the specification of the certificate of addition, to which reference has already been made. Remarks should be made in the outset, in recurring to the last named invention, that the patentee, at the commencement of the specification, refers to the prior patent as the foundation of his improvement, and, throughout the description, proceeds upon the ground, that what is embodied in the certificate of addition, is a modification or improvement upon the invention described in the original patent.

In the introductory part of the description, he characterizes his former invention as a "system for pistols with one barrel," and his statement is, that the new modification or improvement relates to "pistols with several barrels," and there is no mention whatever made of pistols composed of a cylinder of chambers, united with a single barrel, and arranged upon a common center, and so located that, as the cylinder is turned, the several chambers are, in succession, brought in line with the barrel to be fired. Such a pistol is nowhere mentioned, described, suggested, or indicated in any part of the patent, unless it be assumed that the chambers of such a cylinder are the barrels of the pistol, and consequently that a pistol composed of a cylinder, although united to one barrel only, as described, is nevertheless, in the sense of the patent law, a pistol of as many barrels as there are chambers in the cylinder. All will agree, I think, that the patentee, when he framed the specification of his original patent, took no such view of the subject. On the contrary, it is clear, that when he stated that the invention was applicable to pistols with one barrel, he referred to the form of the barrel, as exhibited in the ordinary pistol, except

that it was open at the rear as well as the front end, and there is no solid ground for a different conclusion in respect to the invention embodied in the certificate of addition. Much attention, says the patentee, has been given to different plans of muskets, and especially of pistols, having several barrels that can revolve about a central axis as fast as they are successively discharged. Fire arms of the description mentioned, afford, as he states, the advantage of making it easy to fire as many times as the arm has barrels, without any interruption, but in his view, they also presented disadvantages which it becomes important to notice. He states, that in order to make use of them it was necessary to "unscrew each of the barrels, one after another, then load them, prime them, and screw them on again, each one in its respective place." His new mode of construction was invented to overcome those inconveniences, and he states that it is applicable to all the plans devised for this kind of arms with movable barrels, whether the cartridge does or does not carry the priming on it. Having made these several explanations, he then proceeds to describe the invention, and among other things says: "My invention consists simply in uniting all the barrels against" a single plate or disk, having a central axis, and in confining all these barrels by a single screw, which, while it holds them upon the axis, allows them to turn around it in succession as fast as the discharges take place." Stopping there it would not only be impossible to sustain the view of the respondents, but it would be impossible to entertain any doubt as to the true construction of the patent. But the description does not stop there, and what creates the difficulty is, that there is no translation in the record which is known to be authentic. Respondents presented one, but the complainants insist that it is erroneous, and one or more of their expert witnesses have so testified. Taking the passage in question as translated, the patentee is made to say, that the new arrangement is applicable, with the same ease, to all the mechanisms belonging to pistols with several barrels, as well as in general to the different breech-loading fire arms. Breech-loading is the phrase in dispute, and the original words are, "se chargeants par la culasse." Complainants' experts, one or more of them, testify that the phrase in our language should be, "loading at the breech," instead of "breech loading," as rendered in the translation. Embarrassment certainly arises in determining the question, but there are some considerations affecting the question which are plain and undeniable: First. The translation presented by the complainants is more literal than that assumed by the respondents, as is obvious, even to one but slightly acquainted with the language. Secondly. The question should be examined in view of the other parts of the instrument which are not involved in any doubt. Thirdly. Recurrence should be made to the nature of the in-

vention, in order to ascertain whether it is really applicable to the fire arms involved in this controversy. Fourthly. If it be found that one of the translations is repugnant to other parts of the instrument, and the other is consistent with the other parts, it will be safe, under the circumstances, to adopt the latter, as expressing the real intention of the patentee. Guided by these rules, reference is again made to the description of the invention, which consists, as stated in the specification, simply in uniting all the barrels against a single plate or disk, having a central axis, and in confining all these barrels by a single screw, which, while it held them upon the axis, allowed them to turn as before explained. Looking at that description of the invention, it is obvious that the phrase "se chargeants par la culasse," if it be construed to include such fire arms as that of Samuel Colt, is inconsistent with other parts of the instrument, and incompatible with the nature of the invention, because it can not be so applied without borrowing the improvement held by the complainants, which is nowhere described in the certificate of addition. In view of the whole evidence bearing upon the question, I am of the opinion that Rollin White is the original and first inventor of the improvement described in the patent, on which this suit is founded, so far as respects the first claim of the patent, which is the only one involved in the controversy.

Several other defenses were presented at the argument, but it will be sufficient to say that none of them can be sustained, and they are accordingly overruled. Nothing need be added upon the subject of infringement, as it is virtually admitted in the pleadings and fully proved. The complainants are entitled to an account, and when the amount is ascertained, a perpetual injunction will be granted.

[For another case involving this patent, see Case No. 17,537.]